IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARIE M. McCRAY,

    *Plaintiff,*

    v.

MARYLAND DEPARTMENT OF
TRANSPORTATION, MARYLAND
TRANSIT ADMINISTRATION,

    *Defendants.*

Civil Action No.: ELH-11-3732

**MEMORANDUM OPINION**

This case presents employment discrimination claims arising out of substantial budget cuts implemented in 2008 by Martin O'Malley, as Governor of the State of Maryland (the "Governor"), with the approval of the Maryland Board of Public Works (the "Board"). To balance the State's fiscal year 2009 ("FY09") budget against a projected revenue shortfall of $432 million, the Governor and the Board approved approximately $345 million in budget reductions, which included the elimination of more than 830 State jobs. Over sixty of those positions were at the Maryland Transit Administration ("MTA"), a statutorily created unit within the Maryland Department of Transportation ("MDOT"). The position of "Transportation Engineering Technician III," held by plaintiff Marie M. McCray, was one of the jobs that fell victim to the budget axe in October 2008. At that time, McCray, who is African-American, was a 64-year-old diabetic.

McCray filed suit against the MDOT and the MTA, defendants, on December 27, 2011 (ECF 1), alleging that her position was selected for elimination because of her race, gender, age, and disability, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended,

42 U.S.C. §§ 2000e, *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12101-12113.  Compl. at 1-2; *id.* ¶¶ 24-39.[1]  She seeks compensatory damages as well as "injunctive relief to afford Plaintiff the opportunity to restore her career in state service and reclaim her former position."  *Id.* ¶ 31.[2]

Defendants filed a "Motion to Dismiss, or in the Alternative, Summary Judgment" ("Motion" or "MSJ," ECF 7), contending that because McCray's position was abolished in connection with Maryland's budget cuts, legislative immunity bars her claims.  Defendants further contend that certain of McCray's claims should be dismissed because they were not timely presented to the Equal Employment Opportunity Commission ("EEOC").  And, in the alternative, defendants argue plaintiff has failed to state facts adequate to support her claims for discrimination, and therefore dismissal is proper under Fed. R. Civ. P. 12(b)(6) and 56 as a matter of law.  In support, defendants have proffered affidavits from several administrators involved in selecting the positions to be eliminated, as well as data on those eliminations and the budget cuts more broadly.

---

[1] Although her pleading is not styled as a class action complaint, McCray further "contends that [defendants] used the State's budget crisis of 2008 to target for elimination the positions filled by certain individuals because of race, gender, age, and disability whom officials . . . wanted to remove . . . ."  Compl. at 2.

At least one other plaintiff has filed a complaint in this Court alleging similar claims for discrimination under Title VII as a result of the elimination of her job in September 2009.  *See* Complaint and Request for Jury Trial, *McCleary-Evans v. Md. Transp. Auth., Md. Dep't of Transp.*, Civ. No. ELH-12-1550 (D. Md. May 23, 2012) (ECF 1); *see also* Declaration of Dawnn McCleary-Evans, Opp. Exh. 1, ¶¶ 1-2 ("McCleary-Evans Decl.," ECF 16-2); McCleary-Evans EEOC Right-to-Sue Letter (ECF 16-9).  John H. Morris, Jr., Esq., counsel for plaintiff in the present matter, is also counsel for Ms. McCleary-Evans.  *See* Declaration of John H. Morris, Jr., Esq., ¶¶ 2-3 (ECF 16-17).

[2] Jurisdiction is proper under 28 U.S.C. § 1331.

McCray opposes the Motion ("Opposition" or "Opp.," ECF 16), and has submitted an affidavit under Fed. R. Civ. P. 56(d), requesting an opportunity for further discovery before a decision is issued. *See* Declaration of Plaintiff's Counsel, John H. Morris, Jr., Esq. ("Morris Decl.," ECF 16-17). Defendants have replied ("Reply," ECF 17). The Motion has been fully briefed and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion.

### Factual Background[3]

The MDOT is a "principal department" of the Maryland State government. Md. Code (2008 Repl. Vol, 2012 Supp.), Transp. § 2-101. The MTA is one of nine statutorily created units, or "modal administrations," within the MDOT, *see id.* § 2-107(a)(3), and is responsible for administering the mass transit system in the Baltimore metropolitan area and other parts of the State of Maryland. Compl. ¶ 4. The Secretary of the MDOT, who is appointed by the Governor with the advice and consent of the State Senate, *id.* § 2-102(a), bears statutory responsibility for the budgets of the MDOT and each of its modal administrations. *See id.* § 2-103(a).

McCray worked at the MTA from January 1971 until her position was eliminated in October 2008. Compl. ¶ 7. During the relevant time period, McCray was assigned to the MTA Office of Service Development, *id.* ¶ 14, and was responsible for preparing monthly and annual rider usage reports. *Id.* ¶¶ 8-9. After plaintiff was diagnosed with diabetes in 1995, she began storing medication for her condition at work and administering insulin shots at her office. *Id.* ¶

---

[3] For the purpose of the Motion, the relevant facts are largely undisputed. As discussed, *infra,* to the extent that any material facts are in dispute, I have viewed those facts, including reasonable inferences to be drawn from them, in the light most favorable to plaintiff. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

10. McCray alleges that at no time prior to 2007 did she encounter any difficulties in performing her job as a result of her diabetes. *Id.* ¶ 11. However, on June 14, 2007, she fainted at the office due to low blood sugar, and was sent to the hospital. *Id.* ¶ 12.

After a week off, McCray was cleared by her doctors and returned to work. *Id.* ¶ 13. McCray alleges that, upon returning to the office, Michael Deets, then the Deputy Director of Service Development, questioned plaintiff repeatedly about her health. *Id.* ¶¶ 14-15. Deets, along with Carla Wescott, a human resources official, insisted that she submit to further medical examination by "the State's medical officers at Concerta," but McCray refused in the absence of a written request. *Id.* ¶ 15. After Deets and Wescott procured a written request, McCray underwent an examination by Concerta, and she was cleared to resume work. *Id.* ¶ 17. Nevertheless, Deets continued to question McCray about her health. *Id.* ¶ 18. McCray maintains that Deets was "seeking to justify removing [her] from her position." *See id.*

In early 2008, Deets reassigned McCray's responsibilities for rider reports to a consultant. *Id.* ¶ 19. According to McCray, she did not have other significant job responsibilities, and was unable to obtain additional work. *Id.* ¶ 20.

On October 15, 2008, Deets and MDOT Human Resources Director Judith Slater met with McCray to inform her that her position had been abolished as a result of budget cuts, and that her last day as a MTA employee would be October 30, 2008. *Id.* ¶ 21. At the meeting, McCray received a Memorandum from John D. Porcari, Secretary of MDOT ("Porcari Memorandum," ECF 7-6), that said, in part:

Memorandum

TO:       Marie M. McCray
              Maryland Transit Administration

FROM:      John D. Porcari, Secretary
                  Maryland Department of Transportation

DATE:      October 15, 2008

RE:          Position Abolition

At its meeting earlier today, the Board of Public Works approved the elimination of the appropriation for your position.  As a result, your position will be abolished on October 30, 2008.  Under paragraph 2.3 of the Transportation Service Human Resources System ("TSHRS") Policy 7-H layoff, this action is not considered a layoff.
. . . .

As noted, McCray's position was one of about 830 State jobs[4] abolished in October 2008 by budget cuts instituted by the Governor and the Board of Public Works, pursuant to § 7-213(a) of the State Finance and Procurement Article ("SFP") of the Maryland Code (2009 Repl. Vol.). *See* Press Release, Governor O'Malley, Board of Public Works Cut Over $345 Million From FY09 Budget (Oct. 15, 2008), MSJ Exh. 1 (ECF 7-3), available at http://www.governor.maryland.gov/pressreleases/081015.asp.  The Board is composed of the Governor, the State Comptroller, and the State Treasurer.  *See* Md. Const. art. XII.  It bears responsibility for supervising all public works in the State of Maryland, in addition to duties prescribed by law.  *See id.*

Under Maryland Law, the General Assembly's appropriation for a job position with the State may be abolished in one of three ways: (1) the Governor may omit the position from the annual budget bill presented to the State legislature; (2) the General Assembly may strike an

---

[4] Based on exhibits to defendants' Motion, it appears that only 40 of these positions were actually held by employees at the time the positions were eliminated.  *See* Dep't of Budget & Mgmt. Action Agenda, MSJ Exh. 5 (ECF 7-10).

appropriation included in the budget bill presented by the Governor; or (3) the Governor, with approval of the Board, may reduce an appropriation previously included in the budget bill, as enacted.  *See* 76 Md. Op. Atty. Gen. 330, 1991 WL 626528, at *1 (Sept. 5, 1991); *Judy v. Schaefer*, 331 Md. 239, 258-61, 627 A.2d 1039, 1049-50 (1993) (discussing Governor's authority to strike budget appropriations).  The third method identified above derives from SFP § 7-213(a).  Under that section, the Governor may, "with the approval of the Board of Public Works, . . . reduce, by not more than 25%, any appropriation: (1) that the Governor considers unnecessary; or (2) that is subject to budgetary reductions required under the budget bill as approved by the General Assembly."  *Id.*  The position is then lost by operation of law, just as it would be if the action had been taken in the budget bill by the Governor and the General Assembly.  76 Md. Op. Atty. Gen. 330, 1991 WL 626528 at *5.  On October 15, 2008, pursuant to SFP § 7-213(a), the Board approved the Governor's proposed budget cuts.  Slater Aff. ¶¶ 6-7.

As a result of the FY09 budget cuts, sixty-three positions at the MTA were abolished.  Affidavit of Judith M. Slater, MSJ Exh. 2, ¶ 7 ("Slater Aff.," ECF 7-4); *see* also Transp. § 4-203 ("The [MTA] is entitled to the staff provided in the State budget.").  Of these positions, approximately twenty were actually held by employees at the time; the remaining forty-three positions were unfilled.[5]  *Id.* ¶¶ 6-7.  Data proffered by defendants, both in connection with charges of discrimination filed by McCray with the EEOC, *see* ECF 16-8 (EEOC report listing eliminated positions), and in support of the Motion, *see* ECF 7-5 (list of position eliminations

---

[5]  Submissions filed by MTA/MDOT in response to McCray's EEOC charge of discrimination indicated that twenty-two filled positions at MTA were eliminated.  *See* McCleary-Evans Decl. ¶¶ 6-8.  But, the Affidavits of Judith M. Slater (ECF 7-4) and David L. Fleming (ECF 7-8), filed in support of the Motion, aver that only twenty filled positions were eliminated.  This factual discrepancy is not material to the resolution of the Motion.

proposed by MTA), reflects that, of the twenty MTA employees who lost positions as a result of the budget cuts, nine were classified as white, nine as African-American, one as multi-racial, and one did not report a racial classification; twelve were male and eight were female.[6]

According to Slater, in 2008 MDOT had "directed its modal administrations to identify cost saving measures, including job position reductions, to remedy a significant shortfall in the State Transportation Fund." Slater Aff. ¶ 3. MTA senior management, including Henry M. Kay, MTA Deputy Administrator, in consultation with Michael Deets, then the acting Director of Service Development,[7] identified "potential job functions that were not essential and could be eliminated." Affidavit of Henry M. Kay ¶¶ 2-4 ("Kay Aff.," ECF 7-7). After developing a list of twenty-three occupied positions suitable for elimination,[8] senior management forwarded the

---

[6] The EEOC also reported in a letter to plaintiff that "[o]ut of the 65 positions eliminated during the timeframe October 30, 2008, only six had known disabilities." *See* ECF 16-6. However, no other documentation submitted by the parties reflects the elimination of sixty-five positions. Rather, the documentation reflects elimination of sixty-three positions, *see, e.g.*, ECF 16-7 at 12-13; Slater Aff. ¶ 7. Additionally, the fact that six of the employees whose positions were eliminated were known to have disabilities is reflected only in that EEOC letter.

[7] There is a discrepancy between the title held by Deets as reflected in McCray's Complaint and the title he held as reflected in the Kay Affidavit. As suggested by Kay's reference to "acting Director," I assume that Deets served as Acting Director of Service Development during the FY09 budget cuts, while also retaining his official position of Deputy Director.

[8] That list is included as Attachment 1 to the Slater Affidavit, at ECF 7-5. *See* Slater Aff. ¶¶ 5, 9. The positions on that list are associated with the names of specific employees, including McCray. *See* ECF 7-5. However, the subsequent list sent to the Department of Budget and Management identified positions only by "PIN" number and job title. *See* Affidavit of David L Fleming ¶ 3 ("Fleming Aff.," ECF 7-8); ECF 7-9 (final list of MDOT recommended position eliminations). At least as to the State's judicial branch, it appears that a PIN number is an identification number associated with a job position. *See, e.g.*, Md. Code Regs., Transp., 11.02.01.02.B(21) ("'Position' means a set of duties and responsibilities for a job funded under an approved budget and having an assigned position identification number (PIN).'"); State of Maryland Judiciary, Policy of Recruitment, Examination and Selection ¶ II.C ("Employment

7

list to Paul J. Wiedefeld, then-MTA Administrator.  *See* Slater Aff. ¶¶ 4-5; ECF 7-5.  Wiedefeld,

along with Slater and then-MTA Deputy Secretary Beverle1y Swaim-Staley, approved for

elimination twenty of the twenty-three recommended positions, including McCray's position of

"Transportation Engineering Technician III," and forwarded them to the MDOT.  *See* Slater Aff.

¶¶ 4-5; ECF 7-5.  After MDOT sent its list to the Maryland Department of Budget and

Management, the Governor presented to the Board his recommended budget reductions,

including those from MDOT.  Slater Aff. ¶¶ 6-7; Dep't of Budget & Mgmt. Action Agenda (ECF

7-10).  As noted, the Board approved the Governor's proposed budget on October 15, 2008.

On April 6, 2009, McCray submitted to the EEOC an Intake Questionnaire accusing the

MTA of employment discrimination.[9]  *See* McCray EEOC Intake Questionnaire (ECF 16-1).

The formal EEOC charge, subsequently filed by plaintiff on June 29, 2009, alleged only age-

based discrimination.  *See* June 29, 2009 Charge of Discrimination (ECF 16-7 at 5).  On

September 20, 2010, McCray filed an amended charge, which encompassed discrimination on

the basis of race, gender, and disability.  *See* September 20, 2010 Charge of Discrimination (ECF

16-7 at 8).  On September 26, 2011, after investigation,[10] the EEOC concluded that it could

---

Status")          (Dec.          15,          2005),          available          at
http://www.courts.state.md.us/hr/pdfs/policies/recruitmentexaminationselection.pdf,          ("Each
employee of the Maryland Judiciary occupies a position, which is designated as regular,
contractual, or temporary, and is assigned a Position Identification Number (PIN).").

[9] McCray did not name MDOT as a defendant in any of her EEOC charges.

[10] Based on the exhibits submitted by McCray in support of her Opposition, *see, e.g.*,
ECF 16-7 (MTA "response to particulars" of McCray discrimination charge), it appears that the
EEOC solicited and obtained information from defendants in response to McCray's charge.  *See*
*EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 596 (1981) ("Title VII gives the
Commission two formal means of obtaining information when it investigates a charge: The
Commission may examine and copy evidence in the possession of the respondent employer, §

detect no unlawful discrimination by defendants, and issued a notice to McCray of her right to sue in federal court.  *See* ECF 16-6.

### Standard of Review

A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008); *see Aschroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see, e.g., Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (applying *Twombly* plausibility standard).

Defendants' Motion is captioned as a motion to dismiss under F.R. Civ. P. 12(b)(6), or, alternatively, a motion for summary judgment under Rule 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.[11]  *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011), *aff'd* 684 F.3d 462, 470-71 (4th Cir. 2012).  Ordinarily, a court "is not to consider matters

---

2000e-8(a), and subpoena evidence and documents, § 2000e-9.").  McCray's exhibits likewise indicate that she obtained access to the EEOC's file pertaining to her charge, including responses and documentation filed by defendants.  *See id.* at 598-604 (holding that charging party has right to disclosure of EEOC files pertaining to the charge, including material generated by the investigation).

[11] Fed. R. Civ. P. 12(d) provides:

If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).   But, under Rule 12(d), a district court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."   5C Wright & Miller, Fed. Prac. & Pro. § 1366, at 159 (3d ed. 2004, 2011 Supp.).   However, this discretion "should be exercised with great caution and attention to the parties' procedural rights."   *Id.* at 149.

In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.   *Id.* at 165-67.   If the court considers extraneous material, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."   Fed. R. Civ. P. 12(d).

"[T]he term 'reasonable opportunity' requires that all parties be given 'some indication by the court . . . that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the opposing party to file counter affidavits or pursue reasonable discovery.'"   *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (quoting *Johnson v. RAC Corp.*, 491 F.2d 510, 513 (4th Cir.1974)).   When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."   *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998); *see Gay*, 761 F.2d at 177

("When a party is aware that material outside the pleadings is before the court, the party is on notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment.").[12]

In this case, both sides submitted affidavits and substantial documentary evidence in support of their positions. Each side included a copy of the Porcari Memorandum, which informed McCray that her position had been abolished. *See* ECF 7-9; ECF 16-7 at 10-11.[13] In addition, defendants supported their Motion with affidavits from MDOT/MTA officials involved in the FY09 budget cuts, and with several relevant documents, including MDOT's and MTA's recommended lists of positions to be abolished, which were forwarded up the chain-of-command to the Governor in preparation for the final budget decision. *See* ECF 7-5; ECF 7-9; ECF 7-10. The material filed by plaintiff in support of her Opposition included multiple documents obtained through information requests submitted by plaintiff to defendants and to the EEOC. *See* EEOC Letter of June 29, 2012 (ECF 16-4) (disclosing material responsive to McCray's document requests); MDOT Letter of March 8, 2012 (ECF 16-12) (disclosing material responsive to McCray's Public Information Act Request); *see also* n. 9, *supra*. Plaintiff's submissions also included copies of defendants' filings with the EEOC in response to McCray's EEOC charges, as well as the EEOC's final determinations. *See* McCleary-Evans Decl. ¶¶ 3-9.

---

[12] By contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261; *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997).

[13] Because it was integral to plaintiff's Complaint, and both parties have included it as an exhibit, the Memorandum may be considered without conversion. *See Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (stating that a court may properly consider documents "attached to the complaint, as well those attached to the motion to dismiss, so long as they are integral to the complaint and authentic").

These materials are also accompanied by the declaration of McCleary-Evans, an MTA employee whose position was abolished as a result of budget cuts in September 2009, one year after McCray lost her job.  *See id.*

In my view, it is appropriate to convert the Motion to one for summary judgment.  As noted, defendants captioned their Motion in the alternative, thereby putting plaintiff on early notice of possible conversion to a summary judgment motion, as required under Rule 12(d).  *See Gay*, 761 F.2d at 177.  Furthermore, resolution of the action will be facilitated by consideration of the affidavits and documents submitted by the parties.  *See* Wright & Miller, *supra*, at 159-67. Defendants' exhibits validate their argument for legislative immunity by documenting the process pertaining to the State's FY09 budget cuts.  Plaintiff's exhibits substantiate the basis for her claims, and are responsive to some of defendants' arguments.  And, the substantial documentary evidence previously obtained by plaintiff, and submitted here, demonstrates that both parties have been afforded a "reasonable opportunity" to present material relevant to the issues.  *See Onan v. Cnty. of Roanoke, Va.*, 52 F.3d 321, 1995 WL 234290, at *3 (4th Cir. 1995) (per curiam table decision) (holding that "[plaintiff] had a reasonable opportunity to, and in fact did, submit relevant materials" where both parties submitted exhibits and affidavits with memoranda addressing converted summary judgment motion).

I am mindful that, pursuant to Fed. R. Civ. P. 56(d), plaintiff has requested the opportunity for further discovery, so as to more ably "subject Defendant[s'] discrimination-neutral explanation for its decision-making to rigorous scrutiny."  Morris Decl. ¶ 5; *see* Opp. at 8-11.  As her lawyer explained, he seeks further discovery to "subject Defendant's discriminatory-neutral explanation for its decision-making to rigorous scrutiny to test its veracity

and validity, in order to establish that the proferred rationale was a pretext." Morris Decl. ¶¶ 3, 5. Plaintiff also suggests that additional discovery will reveal "whether officials of the Defendant Agency were manipulating the elimination of PINS to reflect their personal social biases." Opp. at 10. For example, plaintiff seeks to explore, *inter alia*, "the number of underlying positions eliminated, the number of eliminated positions occupied by an existing employee, and the number of such employees with a documented disability." *Id.* at 9.

Fed. R. Civ. P. 56(d) provides that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to a motion for summary judgment, "the court may: (1) defer consideration of the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery;  or (3) issue any other appropriate order." An affidavit under Fed. R. Civ. P. 56(d) must identify, with specificity, the reasons that the party is unable to justify its opposition. Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F.Supp.2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC–08–2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb.14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted); *see Greater Balt. Ctr. For Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 683 F.3d 539, 559-60 (4th Cir. 2012) (holding district court correctly denied further discovery because party requesting extension "ha[d] been unable to point to any item of discovery or fact that would have assisted the district court in addressing the issues").

A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam).  As discussed, *infra*, defendants have invoked the defense of absolute legislative immunity.  Accordingly, insofar as plaintiff opposes the Motion on grounds of legislative immunity, plaintiff must establish that defendants are not entitled to such a defense.

As I see it, the discovery identified by plaintiff as essential to her case is not material to whether defendants are entitled to legislative immunity.  "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).  Thus, before considering the motive of government officials in the context of the defense of legislative immunity, I must resolve "the logically prior question of whether their acts were legislative." *Id.*  Because plaintiff's proposed discovery relates to the motives of individual employees within the MTA and the MDOT in selecting certain positions for elimination, plaintiff has not identified any factual issue pertinent to defendants' motion for summary judgment on the grounds of legislative immunity.

Furthermore, granting the requested discovery would impose the very burdens of litigation that legislative immunity is intended to prevent.  *See Bogan*, 523 U.S. at 54 ("The privilege of absolute immunity 'would be of little value if [defendants] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader . . . .'") (quoting *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951)).  As noted in *Baker v. Mayor & City*

*Council of Baltimore*, 894 F.2d 697 (4th Cir. 1990), overruled on other grounds by *Berkley v. Common Council of the City of Charleston*, 63 F.3d 295, 303 (4th Cir. 1995)), any affirmative defense offered by defendants, and any response thereto, would require testimony by individual government officials who are protected by legislative immunity.[14]  *See Baker*, 894 F.2d at 682 ("Should the plaintiffs make a prima facie case that age was a determining factor in the Board of Estimates' decision, we are unable to conceive of a viable defense which would not include testimony from the Board's members to the effect that they were not motivated by the plaintiffs' ages.").  As the Court said in *Baker*: "[We have] held that this eventuality triggers the immunity protection, and it is on the basis of this controlling precedent that [this action is barred by legislative immunity]."  *Id.* (citing *Schlitz v. Virginia*, 854 F.2d 43, 45 (4th Cir. 1988), overruled on other grounds by *Berkley*, 63 F.3d at 303).

Moreover, plaintiff is not operating on a blank slate.  She already possesses substantial information. As noted in her Opposition, plaintiff relies on various documents that she obtained through information requests submitted by plaintiff to defendants and to the EEOC.  *See* EEOC Letter of June 29, 2012 (ECF 16-4) (disclosing material responsive to McCray's document requests); MDOT Letter of March 8, 2012 (ECF 16-12) (disclosing material responsive to McCray's Public Information Act Request).  Plaintiff's submissions also include copies of defendants' filings with the EEOC in response to McCray's EEOC charges, as well as the

---

[14] *Baker* and *Schlitz v. Virginia*, 854 F.2d 43 (4th Cir. 1988), upon which *Baker* relied in finding legislative immunity, were subsequently overruled by *Berkley v. Common Council of the City of Charleston*, 63 F.3d 295 (4th Cir. 1995), on the limited grounds that *municipalities* are not entitled to absolute immunity from civil rights suits.  *Id.* at 303 ("To the extent that our opinions in *Baker* . . . and *Schlitz* . . . can be read to confer legislative immunity on municipalities from suits brought under section 1983, those decisions are overruled.").

EEOC's final determinations. *See* McCleary-Evans Decl. ¶¶ 3-9. And, plaintiff has submitted an extensive affidavit in support of her contentions. *See id.* This information reflects the number of underlying positions eliminated, the number of eliminated positions occupied by an existing employee, and the number of such employees with a documented disability. She has not explained why this information is inadequate to serve the purposes identified in the Morris Affidavit.

Accordingly, I will deny plaintiff's Rule 56(d) request for further discovery. And, I will review the Motion as a motion for summary judgment, employing the standard of review set forth below.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The "judge's function" in reviewing a motion for summary judgment is not

"to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.  There is a dispute of material fact that precludes summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

### Discussion

The principal argument for dismissal advanced by defendants is that McCray's claims are barred by the doctrine of legislative immunity, because her job was eliminated by legislative act of the Governor and the Board.  *See* Motion at 1.  McCray responds that her claim is based on illegal discriminatory animus harbored by her supervisors, some of whom were involved in making recommendations for the budget cuts, and that "the choosing of some employees rather than others to be subject to the budget cut" is not protected by legislative immunity.  Opp. at 2. Arguing that governmental employers do not have "a license to discriminate in choosing the particular personnel to be subject to the budget axe mandated by the legislature," *id.*, McCray contends that the decision to abolish positions may not be founded on illegal considerations such as race, age, and gender.  *Id.*

In my view, the FY09 budget cuts implemented by the Governor and the Board of Public Works constituted legislative conduct protected by legislative immunity.  Although defendants did not render the final decision in approving those budget cuts, and plaintiff's claims are premised on the claim of discriminatory animus allegedly harbored by her supervisors, defendants are entitled to the defense of legislative immunity for their role in the FY09 budget cuts.

17

### A.   The FY09 Budget Cuts Are Protected By Legislative Immunity

"Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity,'" *Bogan*, 523 U.S. at 54 (quoting *Tenney*, 341 U.S. at 376), and precludes suit premised on conduct within that sphere.[15]  *See id.* at 48-54.  Legislative immunity "also acts to immunize legislators from having to 'testify regarding conduct in their legislative capacity.'" *Baker*, 894 F.2d at 682 (quoting *Schlitz*, 854 F.2d at 45); *see EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011) ("Legislative privilege against compulsory evidentiary process exists to safeguard this immunity and to further encourage the republican values it promotes. . . .  Because litigation's costs do not fall on named parties alone, this privilege applies whether or not the legislators themselves have been sued.").

The doctrine of legislative immunity serves important public interests.  In *Tenney*, 341 U.S. at 377, Justice Frankfurter articulated its underlying rationale:

> Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good.  One must not expect uncommon courage even in legislators.  The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.

And, the Fourth Circuit recently said:

> Legislative immunity's practical import is difficult to overstate.  As members of the most representative branch, legislators bear significant responsibility for many of our toughest decisions, from the content of the laws that will shape our society to the size, structure, and staffing of the executive and administrative bodies carrying them out.  Legislative immunity provides legislators with the breathing

---

[15] The Supreme Court has made clear that legislative immunity applies to suits for both money damages and injunctive relief.  *See Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731-34 (1980).  Thus, absolute legislative immunity would apply to all of plaintiff's claims.

room necessary to make these choices in the public's interest, in a way "[un]inhibited by judicial interference [and] [un]distorted by the fear of personal liability."

*Wash. Suburban*, 631 F.3d at 181 (quoting *Bogan*, 523 U.S. at 52).

To be sure, the Governor and the Board are members of the executive branch of government, rather than the legislative branch. But, courts employ a functional analysis in applying legislative immunity, under which the "nature of the act" determines whether an act is "legislative." *See Bogan*, 523 U.S. at 55-56. Thus, "officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Id.* at 55; *see, e.g.*, *id.* at 55-56 (according legislative immunity to mayor and vice-president of city council for proposing and voting in favor of budget ordinance because "[t]he ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents"); *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 734 (1980) (according legislative immunity to Supreme Court of Virginia and its chief justice for enacting the State Bar Code, because "the Virginia Court is exercising the State's entire legislative power with respect to regulating the Bar, and its members are the State's legislators for the purpose of issuing the Bar Code").

The Fourth Circuit has said that, as a general matter, legislative acts protected by immunity (1) "'involve the adoption of prospective, legislative-type rules, rules that establish a general policy affecting the larger population,'" and (2) "'bear outward marks of public decisionmaking, including the observance of formal legislative procedures.'"[16] *Kensington Vol.*

---

[16] Courts of appeals in other circuits have characterized this standard as a two-part inquiry, asking "whether the activities are 'both substantively and procedurally legislative in nature.'" *Baraka v. McGreevey*, 481 F.3d 187, 198 (3d Cir. 2007) (quoting *In re Montgomery*

*Fire Dep't, Inc. v. Montgomery Cnty.*, 684 F.3d 462, 470-71 (4th Cir. 2012) (quoting *Wash. Suburban*, 631 F.3d at 184). "By contrast, legislators' employment and personnel decisions are generally administrative acts because they most often affect specific individuals rather than formulate broad public policy." *Kensington*, 684 F.3d at 471 (quoting *Wash. Suburban*, 631 F.3d at 184). Notably, considerations of intent or motive of the official, as well as job title, are irrelevant to the determination of whether an act is legislative. *Bogan*, 523 U.S. at 54-56.

The enactment of a budget is regarded as a legislative act. *Kensington,* 684 F.3d at 471. Even in the context of a local government, a policy decision that implicates the "budgetary priorities of [a local government] and the services [it] provides to its constituents" is a quintessential legislative activity. *Bogan*, 523 U.S. at 55-56. When a budgetary decision involves "the termination of a position, [that decision], *unlike the hiring or firing of a particular employee*, may have prospective implications that reach well beyond the particular occupant of the office." *Id.* at 56 (emphasis added). Thus, "the act of eliminating a position altogether instead of merely terminating the employment of a public employee is a uniquely legislative function," *Baker*, 894 F.2d at 682, and one that is protected by absolute legislative immunity. *See Bogan*, 523 U.S. at 54-56 (holding that legislative immunity attaches to local officials' budgetary decisions resulting in elimination of plaintiff's job position); *Kensington*, 684 F.3d at 470-71 (same); *Rateree v. Rockett*, 852 F.2d 946, 950-51 (7th Cir. 1988) (same).

In *Rateree*, the Seventh Circuit held that absolute legislative immunity barred a suit instituted by former employees under 42 U.S.C. § 1983 against the city—their employer—and

---

*Cnty.*, 215 F.3d 367, 376 (3d Cir. 2000)). An act is deemed substantively legislative if it "'involve[s] policy-making decision[s] of a general scope,'" and it is deemed procedurally legislative if it is "'passed by means of established legislative procedures.'" *Baraka*, 481 F.3d at 198 (quoting *Gallas v. Sup. Ct. of Pa.*, 211 F.3d 760, 774 (3d Cir. 2000)).

three city commissioners for eliminating their positions as part of a new city budget.  *See id.* at 950-51.  The employees alleged that their positions had been eliminated in response to their political opposition to the mayor.  *See id.* at 947-48.  As the *Rateree* Court explained, "[a]lmost all budget decisions have an effect on employment by either creating or eliminating positions or by raising or lowering salaries.  This reality, however, does not transform a uniquely legislative function into an administrative one."  *Id.* at 950.  Rather, "[t]he political decision making inevitably involved in exercising budgetary restraint strikes at the heart of the legislative process and is protected legislative conduct."  *Id.* at 950-51.

More recently, in *Kensington Volunteer Fire Department, Inc.*, *supra*, 684 F.3d at 465-67, the Fourth Circuit held that legislative immunity barred suit against Montgomery County, the Montgomery County Council, and certain county officials under 42 U.S.C. § 1983, where plaintiffs lost their jobs as a result of budget cuts instituted to address anticipated revenue shortfalls.  The plaintiffs alleged that the defendants decided to eliminate funding for these positions in retaliation for the plaintiffs' political opposition to other legislation supported by the defendants.  *See id.* at 466-67.  The plaintiffs argued that the County Executive and the Fire Chief, two of the county officials named as defendants, were not shielded by legislative immunity because they were performing executive or administrative functions.  *Id.* at 470.  The plaintiffs sought damages and "an injunction barring defendants from defunding their positions," *i.e.*, the invalidation of the budget enactment, based on the alleged "illicit motives" of the defendants.  *Id.* at 467-70.

Citing *Rateree*, the *Kensington* Court held that the County Executive and the Fire Chief were protected by legislative immunity because they were sued "based on their actions

associated with the budget making process," including "proposing and submitting the budget to the County Council, a task required . . . by local law." *Id.* at 471; *see also id.* (stating that the County Executive and Fire Chief "were tasked with executive and administrative duties, but they are named as defendants based on their legislative activity in proposing, submitting, and advocating for a budget"). Thus, notwithstanding defendants' positions in the executive branch of county government, the defendants were deemed to be legislative actors for purposes of immunity. *See id.* at 470-71.

The Court also held that, under *United States v. O'Brien*, 391 U.S. 367, 383 (1968), a facially valid legislative decision could not be struck down "on the basis of an alleged illicit legislative motive." *Kensington*, 684 F.3d at 467-68. It reasoned that there was "no doubt that Defendants had the authority to pass the budget savings plan, and it appear[ed] to be a thoroughly ordinary cost savings measure." *Id.* at 468. Consequently, the Court declined to look behind the facially valid budget decision in order to strike it down for unlawful motives. *Id.* at 468-70.

Here, although the FY09 budget cuts were undertaken by the State's executive branch and resulted in McCray's job termination, they were legislative in function because they conformed to formal legislative procedures. *See Bogan*, 523 U.S. at 54-56; *Kensington*, 684 F.3d at 470-71; *Rateree*, 852 F.2d at 950-51. Moreover, the budget cuts reflected discretionary policymaking decisions that affected the broader population. *See Bogan*, 523 U.S. at 54-56; *Kensington*, 684 F.3d at 470-71; *Rateree*, 852 F.2d at 950-51.

First, the budget cuts "bear the outward marks of public decisionmaking, including the observance of formal legislative procedures." *Kensington*, 684 F.3d at 470-71. McCray's job

was one of several hundred positions abolished under a budget reduction duly approved by the Governor and the Board, in accordance with SPF § 7-213(a).  As previously noted by the Attorney General for the State of Maryland, SPF § 7-213 is one of three available options to strike appropriations previously approved by the General Assembly.  *See* 76 Md. Op. Atty. Gen. 330, 1991 WL 626528, at *1; *Judy*, 331 Md. at 258-61, 627 A.2d at 1049-50 (discussing Governor's authority to strike budget appropriations).  "All three decisions are legislative in character and all three have the force of law."  76 Md. Op. Atty. Gen. 330, 1991 WL 626528 at *2.  And, in enacting the FY09 budget cuts, the State's executive branch "certainly governed 'in a field where legislators traditionally have power to act.'"  *Bogan*, 523 U.S. at 56 (quoting *Tenney*, 341 U.S. at 379).  Indeed, the Maryland Court of Appeals has held that the Governor's decision to eliminate funding in the budget for an existing position under SPF § 7-213(a) is a legislative act.  *See, e.g.*, *Worker's Compensation Comm'n v. Driver*, 336 Md. 105, 118-124, 647 A.2d 96, 103-105 (1994) (holding that Governor's decision to abolish job position through elimination of funding is legislative); *Judy*, 331 Md. at 258-62, 627 A.2d at 1049-51 (characterizing Governor's budget authority as legislative, and comparable to the authority of General Assembly in budget matters).[17]  Notably, McCray does not dispute that her position was eliminated as part of a facially valid budgetary process.

---

[17] The legislative character of the FY09 budget cuts certainly precludes an award of injunctive relief to McCray under *O'Brien*, 391 U.S. at 383, and *Kensington*, 684 F.3d at 468-72. Although not discussed by either side, *Kensington* cited *O'Brien*, and stated that it is error to award injunctive relief in the form of striking a facially valid budget decision based on a plaintiff's allegations of a discriminatory motive.  *Kensington*, 684 F.3d at 468-70; *see O'Brien*, 391 U.S. at 383 (holding that a facially valid legislative decision may not be struck down "on the basis of an alleged illicit legislative motive").  But, as noted, *supra* n.15, legislative immunity applies to suits for both money damages and injunctive relief.

Second, the joint decision of the Governor and the Board to eliminate funding for McCray's job position in adopting the FY09 budget cuts carried "prospective implications that reach[ed] well beyond the particular occupant of the office." *Bogan*, 523 U.S. at 56; *see Kensington*, 684 F.3d at 470-71 (stating that legislative acts "involve the adoption of prospective, legislative-type rules, rules that establish a general policy affecting the larger population"). It is undisputed that, at the relevant time, the Governor was faced with a significant revenue shortfall, requiring substantial cutbacks in funding across the State. *See* ECF 7-3. These cuts involved eliminating funding for 830 State positions, and totaled $347 million in spending reductions. *See* Dep't of Budget & Mgmt. Action Agenda, MSJ Exh. 5 (ECF 7-10). The decision to cut funding for specific MTA positions "strikes at the heart of the legislative process and is protected legislative conduct." *Rateree*, 852 F.2d at 950-51.

Although only 40 of the positions were filled by State employees at the time of the cuts, *see* Dep't of Budget & Mgmt. Action Agenda (ECF 7-10), "the effect [of the budget cuts] was not felt by plaintiff[] alone," *Kensington*, 684 F.3d at 468. Rather, the cuts eliminated funding for a variety of positions and projects, *see* ECF 7-10 (identifying categories of funding subject to budget cuts), and therefore did not amount to an administrative employment decision. *See Alexander v. Holden*, 66 F.3d 62, 67 (4th Cir. 1995) (holding that defendants could not invoke legislative immunity for "the elimination of a particular position's salary, the consolidation of that position with another, and a refusal to hire or reappoint [plaintiff] to the newly created position," because such conduct amounted to an "administrative employment decision"). Additionally, although plaintiff has alleged that several employees who lost their positions between 2008 and 2010 were subsequently rehired for other jobs, very few of the terminated

employees regained employment.  *See* ECF 16-14 (documenting "layoff and rehire of MTA employees," per McCleary-Evans's calculations, according to which five MTA employees were rehired after losing their jobs during the FY09 cuts).  And, unlike in *Alexander*, there is no indication that the individuals involved in terminating funding for plaintiff's position were involved in rehiring these other employees.  Thus, in my view, these subsequent hiring decisions do not alter the fact that the budget cuts in issue were legislative.

In sum, just as in *Bogan*, *Kensington*, and *Rateree*, the FY09 budget cuts were legislative in character.  That the cuts were administered by executive branch officials does not preclude application of the legislative immunity doctrine.

### B.  Defendants May Invoke Legislative Immunity

McCray does not offer any counterargument to the applicability of legislative immunity as to the budgetary process at issue in this case.  Indeed, McCray cites no case in law in her opposition to defendants' invocation of legislative immunity.  Instead, plaintiff states that "the focus of the allegations of [her] Complaint is not the decision of the legislature to take action to eliminate a given number of positions.  Rather, the Plaintiff's concern is the decision-making of the executive branch managers in selecting [those] who would be burdened by the positions eliminations and [those] who would not."  Opp. at 7.  McCray argues that, as a result, legislative immunity does not apply.

I recognize that McCray sued the MDOT and the MTA, not the Governor or the Board.  However, defendants merely *recommended* eliminating the position occupied by McCray; they did not legally effectuate the budget cuts in doing so.  Deets, one of the supervisors whom McCray alleges harbored discriminatory animus, and other employees of the defendants,

apparently were involved in identifying positions for which funding could be eliminated in preparation for the FY09 budget cuts. *See* Kay Aff. ¶ 4. Nonetheless, I am persuaded that under *Baker*, 894 F.2d at 680-82, McCray cannot circumvent absolute legislative immunity on the ground that a supervisor involved in making recommendations for the FY09 budget harbored discriminatory intent. Additionally, I am persuaded that defendants may invoke legislative immunity because they are "named as defendants based on their legislative activity in proposing, submitting, and advocating for a budget," *Kensington*, 684 F.3d at 471, and played "integral steps in the legislative [budget] process." *Bogan*, 523 U.S. at 55.

Where an employee's job position is eliminated by operation of a budget cut, the employee may not evade legislative immunity by invoking discriminatory animus on the part of individuals who merely recommended elimination of the position. *See Baker*, 894 F.2d at 680-82. Rather, only the motive of the final decisionmaker in eliminating the job position—here, the Governor and the Board—is at issue. *Id*. And, as noted, the applicability of legislative immunity does not depend on a defendant's motives, because "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *See Bogan*, 523 U.S. at 54 (holding that lower court "erroneously relied on [government officials'] subjective intent in resolving the logically prior question of whether their acts were legislative").

*Baker*, *supra*, 894 F.2d 679, is instructive.[18] There, the plaintiffs sued the Mayor and City Council of Baltimore for age discrimination under the Age Discrimination in Employment

---

[18] As noted, *supra* n.14, *Baker* was overruled on other grounds by *Berkley*, 63 F.3d at 303. Importantly, however, the Fourth Circuit did not retract its reasoning behind application of legislative immunity in the budget context presented here. *See Burtnick v. McLean*, 76 F.3d 611, 613 n.1 (4th Cir. 1988) ("*Berkley* only overruled *Baker*'s holding that municipalities enjoyed

Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, after their jobs were eliminated in connection with cuts

in a Budget Ordinance proposed by the Board of Estimates and adopted by the Mayor and City

Council. *See Baker*, 894 F.2d at 680-81.   The Mayor had directed all department heads to

recommend budget cuts in their respective agencies for the upcoming fiscal year.   *Id.* at 680.

Hentschel, the head of the Real Estate Department, a division of the Department of the

Comptroller, recommended elimination of plaintiffs' jobs because their duties could be spread

out among other city employees. *Id.*   At the time, one plaintiff was 60 years old and the other

was 64. *Id.*   The Comptroller approved the recommendation and submitted it to his superior, the

Finance Director, who, in preparing a preliminary operating budget for the City, recommended

the elimination of only one of the positions. *Id.* at 680-81.   In preparing its Budget Ordinance,

however, the Board of Estimates decided to eliminate both jobs, and the Board's Budget

Ordinance was subsequently approved by the Mayor and the City Council. *Id.* at 681.

Ultimately, about 300 jobs were eliminated from the City budget. *Id.*

The plaintiffs claimed that legislative immunity did not apply to an administrative

decision that constituted an illegal employment decision, and "was merely ratified by the City

Council." *Id.*   The Fourth Circuit disagreed, stating, *id.*:

> Our first task is to determine which city official's discriminatory intent should be
> looked to in assessing liability under the ADEA.   [Plaintiffs] argue that the City's
> liability arises from the discriminatory "employment decisions" of Hentschel and
> the Comptroller in recommending the job eliminations.   Hentschel's position on
> the lowest rung of the budget-making ladder militates strongly against allowing
> his actions, regardless of the discriminatory intent, to result in liability against the
> City.   His recommendations were just that; they certainly did not bind the
> Comptroller, the Finance Director, Board of Estimates, the City Council or the
> Mayor.   Similarly, the Comptroller's recommendations were not binding on the

legislative immunity.  The court's finding in *Baker* that the Board of Estimates and its members
function in a legislative capacity during the budget process still stands.").

higher authorities. To permit the advice or recommendation of low-level personnel to constitute the basis for ADEA liability would impose unwarranted and intolerable burdens on employers, and we decline to do so.

Rather, the Court held that the Board of Estimates, as "the 'real authority and power' in the budget process," was the proper focus of the lawsuit, noting that it "is vested with broad discretionary powers in formulating, determining and executing the City's fiscal policy. . . ." *Id.*[19] And, the Board of Estimates, an executive agency, was nonetheless protected by legislative immunity, based on the functions it performed in rendering the final decision to "exclude an appropriation for a given purpose, *e.g.*, an agency position." *Id.* The Court said: "The act of eliminating a position altogether instead of merely terminating the employment of a public employee is a uniquely legislative function." *Id.* at 682 (citations omitted).

As in *Baker*, the Governor's decision to adopt defendants' recommendations, and the Board's approval of the Governor's budget cuts, constituted the conduct that legally eliminated funding for McCray's position. *See* 76 Md. Op. Atty. Gen. 330, 1991 WL 626528, at *2 (calling role of Board of Estimates in Baltimore budget system an "analogue" of Governor's role in State of Maryland budget system, under both of which executive branch may eliminate budget appropriations) (citing *City of Baltimore v. AFSCME*, 281 Md. 463, 374 A.2d 896 (1977)). The recommendations made by the MTA and the MDOT to abolish McCray's position in connection with the budget cuts for FY09, based on the preliminary recommendations made by Deets, Kay, and others, were not binding on either the Governor or the Board. *See Driver*, 336 Md. at 119, 647 A.2d at 103 ("That the [budget cuts instituted by the] General Assembly and the Governor

---

[19] By comparison, the City Council was "limited to merely reducing or eliminating any proposed expenditures, but [could] not insert any new amounts." *Id.*

may have been motivated by recommendations from state agencies can have no relevance in determining the effects of their official actions. . . .  The making of recommendations of state agencies did not convert the state agencies into decision makers.").  Accordingly, on the facts presented here, "the advice or recommendation of low-level personnel" does not "constitute the basis for [employment discrimination] liability."  *See Baker*, 894 F.2d at 681.

Legislative immunity is justified even were I to disregard *Baker* and, as McCray suggests, scrutinize the roles specifically played by defendants, as opposed to the Governor and the Board.  As noted, *supra*, legislative immunity hinges on the nature of the act, and extends to governmental actors that are not formally part of the legislative branch.  *See, e.g.*, *Consumers Union*, 446 U.S. at 731-34 (according Virginia Supreme Court and its Chief Justice legislative immunity when acting in legislative capacity of enacting State Bar Code).  When an individual plays an "integral role in the legislative process," that person may invoke legislative immunity.  *Bogan*, 523 U.S. at 55; *see Kensington*, 684 F.3d at 471 (granting legislative immunity for executive branch officials' "proposing, submitting, and advocating for a budget").  Accordingly, courts have concluded that lower-level executive branch officials, with advisory roles in the legislative process, are entitled to legislative immunity.  *See, e.g.*, *Baraka v. McGreevey*, 481 F.3d 187, 196-97 (3d Cir. 2007) (holding that governor's appointee's actions in "advising and counseling Governor McGreevey and the Legislature are also legislative" and protected under legislative immunity); *Aitchison v. Raffiani*, 708 F.2d 96, 99-100 (3d Cir. 1983) (holding that borough attorney was entitled to absolute legislative immunity for role in advising drafting of legislation abolishing plaintiff's job position); *Bryant v. Jones*, 575 F.3d 1281, 1305-07 (11th Cir. 2009) (holding county executive's assistant entitled to legislative immunity for developing

and drafting budget resulting in eliminating plaintiff's position).   Put another way, recommendations made to assist legislative activity, involving the same discretionary policy decisions for which the ultimate legislative act is given immunity, are also protected by legislative immunity.  *See Bogan*, 523 U.S. at 55 (granting immunity for mayor's introduction of a budget to city council); *Green v. DeCamp*, 612 F.2d 368, 371 (8th Cir. 1980) (extending legislative immunity to "committee counsel [for state senate committee] as well as the state senators 'insofar as the conduct of the (aid) would be a protected legislative act if performed by the Member himself.'") (quoting *Gravel v. United States*, 408 U.S. 606, 615 (1972)).

In this case, the recommendations submitted by defendants in response to the Governor's request for cost-cutting measures, including job position eliminations, involved the same exercise of discretion as the Governor and the Board, and were undertaken in direct assistance of formulating and passing budget cuts.  According to affidavits submitted by defendants, MDOT and MTA were responsible for identifying expenditures that could be cut in order to help balance the State's transportation fund, including job positions for which funding could be eliminated. *See* Slater Aff. ¶ 3; Kay Aff. ¶¶ 2-4.  Thus, just like the government officials in *Rateree* and the county commissioners in *Kensington,* the MDOT and the MTA are "named as defendants based on their legislative activity in proposing, submitting, and advocating for a budget."  *Kensington*, 684 F.3d at 471.   In this light, defendants engaged in "legislative activity in proposing, submitting, and advocating for a budget," *id.*, and their recommendations constituted "integral steps in the legislative [budget] process," so as to be protected by legislative immunity.  *Bogan*, 523 U.S. at 55.

I recognize that, in the recent decision of *Staub v. Proctor Hospital*, ___ U.S. ___, 131 S. Ct. 1186 (2011), the Supreme Court held cognizable a "cat's paw" theory of liability[20] against an employer under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), which permits liability where a person's membership in the military constitutes "a motivating factor" in an adverse employment action. *See id.* at 1190-94 (citing 38 U.S.C. § 4211(c)). Under the "cat's paw" theory accepted in *Staub*, if a supervisor performs an act motivated by discriminatory animus that is intended to cause adverse employment action, and if that act is the proximate cause of the ultimate employment action, then the employer may be held liable. *See id.* at 1194.[21] Although *Staub* was limited to the USERRA, the Fourth Circuit has endorsed this theory in the Title VII and ADEA context, so long as the individual harboring unlawful motives is, in effect if not in name, "the one principally responsible for the decision or the actual decisionmaker for the employer." *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) ("[A]n aggrieved employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer.").

---

[20] The term "cat's paw" theory is derived from one of Aesop's fables, in which a monkey flatters a cat into plucking roasted chestnuts from a fire; because the cat burns its paws in the process, the monkey is able to steal the chestnuts. *See Staub*, 131 S. Ct. at 1190 n.1. Judge Posner first incorporated this terminology into the employment law context in *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).

[21] In holding that the supervisor need only be a "proximate cause" of the adverse decision, the Supreme Court rejected Seventh Circuit precedent that liability may only be established where the supervisor exercises a "singular influence" over the ultimate decisionmaker. *See Staub*, 131 S. Ct. at 1190.

The "cat's paw" theory validates the possibility that individuals other than the final decisionmaker may exert an influence on the outcome of an employment decision, thereby imbuing that decision with discriminatory animus that might otherwise be lacking. *See id.* at 1191-94. In contending that defendant's liability may be premised on a supervisor's alleged animus, McCray has implicitly invoked a "cat's paw" theory of liability.

However, neither *Staub* nor *Hill* addressed the viability of a "cat's paw" theory in connection with legislative immunity. Indeed, accepting such a theory would appear to undermine the very purpose of legislative immunity, which is to preserve the exercise of independent judgment in the legislative context, unhindered by the threat of litigation. *See Tenney*, 341 U.S. at 377. If a "cat's paw" theory constituted an exception to legislative immunity, thereby subjecting legislators to suit for the biases held by their subordinates, even the purest legislators could not avoid liability for the "uninhibited discharge of their legislative duty." *Id.*; *see Staub*, 131 S. Ct. at 1192 (reasoning that "the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause" of the adverse employment action).

Moreover, litigation of a case premised on a "cat's paw" theory would require an examination of the legislative actor's exercise of judgment—specifically, to determine whether the animus held by the supervisor was, in fact, a proximate cause of the legislative actor's final decision. *See Staub*, 131 S. Ct. at 1194 (remanding for determination as to whether supervisors' actions were "causal factors underlying [the] decision to fire [plaintiff]"). Such an inquiry would put a defendant's intent into play before answering the logically prior question of whether the defendant is entitled to legislative immunity. *See Bogan*, 523 U.S. at 54. And, "[l]egislators

must be permitted to discharge their legislative duties without fear of being subjected to the cost and inconvenience of a trial at which their motives come under scrutiny." *Holliday v. Rainey*, 964 F.2d 1441, 1443 (4th Cir. 1992). This is so "whether or not the legislators have been sued." *Wash. Suburban*, 631 F.3d at 181. Thus, in my view, *Staub*—and the "cat's paw" theory articulated by plaintiff—has little bearing on this case.

Accordingly, I conclude that legislative immunity bars McCray's suit. Therefore, I need not reach defendants' alternative arguments in favor of dismissal.

### Conclusion

For the foregoing reasons, I will grant defendants' "Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment" (ECF 7), and deny plaintiff's motion for discovery under Fed. R. Civ. P. 56(d) (ECF 16). A separate Order, consistent with this Memorandum Opinion, follows.


Date: January 16, 2013                                      _____/s/_____

                                                            Ellen Lipton Hollander
                                                            United States District Judge